IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JAMES MICHAEL RECCA,

                    Plaintiff,                          **8:18CV556**

          vs.

PIGNOTTI, JOESPH RICHTER (2019),          **MEMORANDUM**
NASS (1886), and  HANSEN (2043), in        **AND ORDER**
their respective individual capacities,

                    Defendants.

          This matter is before the court on Defendants' motion for summary judgment
(Filing No. 46).  Defendants are four Omaha police officers who are sued in their
individual capacities under 42 U.S.C. § 1983.  The court finds each Defendant is
entitled to qualified immunity.[1] Defendants' motion therefore will be granted, and
Plaintiff's action will be dismissed with prejudice.

## I. BACKGROUND

          Plaintiff alleges that on November 3, 2015, at about 1:30 a.m., he was walking
in a wooded area at the rear of the Carol Hotel in Omaha, Nebraska, when he saw
police officers arrive; that Plaintiff laid face-down on the ground to get out of the
way of any police action, but the K-9 officer, Defendant Pignotti, gave his dog verbal
commands and hand signals to attack Plaintiff; that the dog ripped off Plaintiff's left
ear and bit his right shoulder and right leg, leaving deep wounds; and that Defendants

---

          [1] "Liability for damages for a federal constitutional tort is personal, so each
defendant's conduct must be independently assessed." *Wilson v. Northcutt*, 441 F.3d
586, 591 (8th Cir. 2006); *see Franklin for Estate of Franklin v. Peterson*, 878 F.3d
631, 632 n. 2 (8th Cir. 2017) ("[Q]ualified immunity is a personalized inquiry and
courts are charged with evaluating the officials' conduct individually.").

Nass, Richter, and Hansen not only failed to intervene, but also kicked and punched Plaintiff while he was on the ground being attacked by the dog. (Filing No. 14.)

In a Memorandum and Order filed on May 29, 2019, the court found on initial review of Plaintiff's Amended Complaint that plausible claims for relief were stated against Defendants for alleged violations of Plaintiff's Fourth Amendment rights.

## II. SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a).

In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *See Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

"There is a genuine dispute when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (internal quotations and citations omitted). "A fact is material if it 'might affect the outcome of the suit.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the moving party believes show the lack of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the moving party does

2

so, the burden then shifts to the nonmoving party, who "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted. *Smith-Bunge v. Wisconsin Cent., Ltd.,* 946 F.3d 420, 424 (8th Cir. 2019).

## III. SUMMARY JUDGMENT PROCEDURE

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

This court's local rules further specify that "[t]he moving party must include in the brief in support of the summary judgment motion a separate statement of material facts," which "should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph." NECivR 56.1(a) (underlining in original). "The statement must not contain legal conclusions." *Id.*

The opposing party's brief must include "a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). "Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if

applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed." *Id.*

A party's failure to comply with these requirements can have serious consequences: The moving party's "[f]ailure to submit a statement of facts" or "[f]ailure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion for summary judgment." NECivR 56.1(1)(a) (underlining omitted). On the other hand, "[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(1)(b)(1) (underlining omitted).

## IV. EVIDENCE PRESENTED

In this case, Defendants' brief in support of their motion for summary judgment contains a separate, 19-paragraph statement of material facts with proper references to the record. Plaintiff has not responded to Defendants' motion for summary judgment. While Plaintiff's failure to file an opposing brief is not considered a confession of the motion, *see* NECivR 7.1(b)(1)(C), his failure to controvert Defendants' statement of material facts is considered an admission for purposes of deciding the motion. *See* NECivR 56.1(1)(b)(1); Fed. R. Civ. P. 56(e)(2) ("If a party … fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

## V. STATEMENT OF FACTS

The court finds there is no genuine dispute regarding the following facts, which are set out in Defendants' brief:[2]

     1.    On November 2, 2015 at 10:40 p.m., Omaha Police Officer Mike Nass was dispatched to 2234 S. 141st Plaza in Omaha,

---

[2] Under each paragraph Defendants have referenced their supporting evidence. Such references are omitted here.

4

Nebraska, where the owner of a 2001 Chevrolet Monte Carlo reported that two males attempted to steal his vehicle.

2.     The owner of the Monte Carlo got into another vehicle and activated the other vehicle's alarm. One of the suspects attempting to steal the Monte Carlo owner's vehicle matched the description of the Plaintiff – white male, late 20s to early 30s, approximately 5 feet 10 inches tall, 220 pounds, shaved head with dark hair.

3.     The two male suspects attempted to confront the Monte Carlo's owner and ram his vehicle. The suspect matching the description of the Plaintiff drove off in a black four door sedan with a cracked windshield. A witness reported the plates to be Nebraska TVA296.

4.     Omaha Police Officer Conrad Hansen located a black 2010 Chrysler Sebring (VIN 1C3CC5FB5AN158868), Nebraska license plate TVA976 that had been reported stolen in the rear parking lot of the Carol Hotel, located at 4888 S. 118th Street in Omaha, Nebraska. The vehicle had a cracked front windshield. In addition, a box of ammunition was seen by Omaha Police Officers in the center console of the vehicle and a spent casing was seen by the officers between the back window and the trunk.

5.     Officers Mike Nass and Joseph Richter were dispatched to assist Officer Hansen at the Carol Hotel. Officer Hansen noticed people suspiciously watching the police investigate the vehicle and then disappearing when the police officers looked at them. Officers Nass and Richter went to look for these individuals.

6.     Officer Richter located three individuals near 118th and M Streets. Officer Richter yelled "Stop, Police!" The three individuals ran – one to the east and two to the southwest. The two suspects that ran to the southwest – one was a female and one was a male who matched the description of the attempted car thief (and the Plaintiff). Officer Richter and Officer Nass called for backup and the Canine Unit, and Officer Randy Pignotti responded with Police Service Dog Bruno.

7.      Officer Pignotti determined whether it was appropriate to deploy Police Service Dog Bruno. He considered that the suspects were unknown, the suspects had fled from a stolen vehicle, the suspects were wanted for attempted automobile theft and attempted felony assault, there was ammunition and a spent shell casing in the vehicle, it was unknown if the suspects were armed, one of the suspects (later identified as the Plaintiff) was a large male, the suspects fled to a creek with running water, trees, trash, rocks, and other debris, the area was dark, the terrain was dangerous, the suspects could plan an ambush in the wooded area, improvised weapons were possible, the suspects could see the officers coming, and the suspects were given an opportunity to surrender. He then made three loud announcements, two in English and one in Spanish, stating "Omaha Police K9, sound off now or I'll send my dog." The announcements could be heard from at least 200-300 yards. There was no response. So, Officer Pignotti deployed Police Service Dog Bruno.

8.      Omaha Police Officers established a perimeter, and Officers Nass, Richter, Pignotti and Police Service Dog Bruno began searching the wooded area near Hell Creek. After a few minutes, Officer Nass found tracks. Police Service Dog Bruno then found the scent. Bruno located the Plaintiff lying on the west bank of Hell Creek with his shirt covering his head.

9.      Police Service Dog Bruno apprehended the Plaintiff, biting him in the right armpit area. The Plaintiff began thrashing around. Officer Pignotti told the Plaintiff to stop fighting the dog and put his hands up. The Plaintiff instead knocked Police Service Dog Bruno into the creek.

10.      Police Service Dog Bruno began apprehending the Plaintiff again, biting the Plaintiff on the right calf. Again, Officer Pignotti told the Plaintiff to put his hands up and stop fighting the dog. The Plaintiff began to punch the dog, grab his muzzle, and push the dog's head underwater, attempting to drown the dog.

11.      Officer Pignotti went into the creek, got his footing, and went over [to] the location of Police Service Dog Bruno. Officer Pignotti continued to command that the Plaintiff stop fighting the dog

6

and put his hands up. When the Plaintiff continued to fight and try to drown the dog, Officer Pignotti punched the Plaintiff in his head (approximately 3 punches to each side of the head). Officers Nass and Richter attempted to grab the Plaintiff from higher up on the creek bank.

12.     After Officer Pignotti punched the Plaintiff approximately six times, the Plaintiff put his hands up and stopped resisting. Officer Pignotti immediately grabbed Police Service Dog Bruno, and Bruno released the Plaintiff's right calf.

13.     Officers Richter and Nass pulled the Plaintiff out of the water up the bank, and put the Plaintiff in handcuffs. The Plaintiff was then taken to an Omaha Fire Department ambulance, which took him to ACH Bergan Mercy Medical Center.

14.     The Plaintiff suffered dog bite injuries to his right arm/armpit area and his right calf. The Plaintiff also had some blood coming from his ear.

15.     Officer Hansen secured the stolen vehicle during this time and did not witness the search, apprehension, or arrest of the Plaintiff.

16.     Police Service Dog Bruno bit the Plaintiff for a total of about 15 to 30 seconds, while the Plaintiff was resisting arrest and attempting to drown the dog.

17.     The Plaintiff stated in his Motion to Strike Defendants Motion to Amend Progression Order that, "There is nothing for the Defendants attorney to review or dispel of any issues of fact because all of the facts are already proven to be true facts, by way of police reports and hospital records."

18.     At Bergan Mercy Hospital, the Plaintiff received 10 stitches to his left ear, 5 stiches to his armpit area, and 4 stitches to his leg. He was given a tetanus shot, antibiotic, and pain killer. He was then transported to the Omaha Police Central Station.

19.     The Plaintiff was soaking wet from being in the creek.

(Filing No. 47, pp. 4-8.)

# VI. DISCUSSION

Qualified immunity shields government officials from suits for damages under § 1983 if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hamner v. Burls*, 937 F.3d 1171, 1175 (8th Cir. 2019), *as amended* (Nov. 26, 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The immunity is an *immunity from suit*, not merely from liability. *Id.* (emphasis in original).

Qualified immunity is designed "to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*, 934 F.3d 876, 881 (8th Cir. 2019) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)).

"Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003) (quoting *Greiner v. City of Champlin*, 27 F.3d 1346, 1352 (8th Cir. 1994)).

The court must follow a two-step inquiry in a qualified immunity analysis: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Jackson v. Stair*, 944 F.3d 704, 710 (8th Cir. 2019) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)). If Plaintiff cannot satisfy both prongs, Defendants are entitled to qualified immunity. *See Correia v. Jones*, 943 F.3d 845, 847 (8th Cir. 2019); *see also Davis v. Chase Cty. Sch. Dist. No. 536*, No. 7:17-CV-5007, 2019 WL 1506690, at *4 (D. Neb. Apr. 5, 2019) ("To withstand a motion for summary judgment on qualified immunity

grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated the plaintiff's clearly established right.").

Courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). In this case, the court will examine both prongs, beginning with the question of whether the facts would support a finding that Defendants violated Plaintiff's constitutional rights.

### A. Defendants' Actions Were Objectively Reasonable

A claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of a person is properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Objective unreasonableness is 'judged from the perspective of a reasonable officer on the scene,' in light of 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Wilson v. Lamp*, 901 F.3d 981, 989 (quoting *Graham*, 490 U.S. at 396). The court may also consider the result of the force. *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009). "Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat." *Wilson*, 901 F.3d at 989 (citing *Smth*, 586 F.3d at 581).

"[R]eview of excessive force claims involving police dogs is properly governed by the general standard established in *Graham* rather than the deadly force standard of [*Tennessee v. Garner*, 471 U.S. 1 (1985)]." *Kuha v. City of Minnetonka*, 365 F.3d 590, 598 (8th Cir. 2003), *abrogated on other grounds by Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007) (en banc). In *Kuha*, as in the present

case, the defendant police officers moved for summary judgment based on qualified immunity. The record in *Kuha* established the following facts:

> On the evening of September 22, 1999, Kuha went to a bar with friends. He states that he had four or five beers at the bar and then drove to a friend's house. Kuha claims he left his friend's home at approximately 1:00 a.m., intending to drive home. Shortly after leaving, he drove his car into a roadside curb, damaging the car and flattening the tire. Kuha walked back to his friend's house to get help. He and his friend changed the tire and placed the damaged tire on the front seat of the car. Kuha then continued on his way home.

> At approximately 5:30 a.m., Kuha encountered Officer Roth, a Minnetonka police officer, who was driving in the opposite direction. Kuha failed to dim his lights when he approached the oncoming police car. Officer Roth made a u-turn and pulled Kuha over. Officer Roth called in the vehicle's license plate information and started to get out of the car for what appeared to be a routine traffic stop.

> At this point, Kuha opened his door, got out, looked at the officer, and ran from his car, heading for a ditch and swamp abutting the road. Officer Roth attempted to follow Kuha but Kuha disappeared into the swamp. Beyond the swamp was a hilly area with high grass and dense brush and foliage. Beyond that were apartment and office buildings. Officer Roth returned to his police car and called for back-up. While waiting for back-up, Officer Roth inspected Kuha's car, noting its damage and the flat tire on the front seat. He also found Kuha's wallet and concluded that the picture on the license matched that of the person who had fled from the scene.

> Within minutes, Officers Warosh and Anderson arrived. They were accompanied by Officer Anderson's K-9 partner, "Arco." Arco is trained under a "bite and hold" method; thus, if given a "find" command, Arco will find, bite and "hold" a suspect until commanded to release. While tracking Kuha, Officer Anderson held Arco's leash in one hand and a flashlight in the other. Officer Warosh provided cover for the K-9 team. Arco remained on his leash as they tracked plaintiff up a steep, woody hill and toward a grassy field.

Approximately thirty minutes after the initial stop, and as the K-9 team reached the top of a hill, Arco alerted, indicating that plaintiff was relatively nearby. At this point, Arco was around ten feet out on his lead. Arco bounded into the three-foot-high grass and "seized" Kuha. Arco is trained to bite and hold the first body part that he reaches. In this instance, Arco bit Kuha's upper leg. Kuha was naked except for his boxer shorts. He claims that he took off his clothes after swimming through the swamp because they were wet and cold.

Kuha states that he held his hands up to surrender as the officers approached and before Arco bit him, but concedes that the officers may not have seen him because of the high grass. The officers aver that they did not see the seizure but instead heard Kuha scream and arrived on the scene immediately thereafter. Prior to calling off Arco, Officers Anderson and Warosh inspected the area around and under Kuha to ensure he was unarmed. During this time, Kuha gripped Arco's head trying to free his hold. Officer Anderson repeatedly told Kuha he would not call off the dog until Kuha let go of the dog and put his hands up. Kuha eventually complied and Officer Anderson called off the dog. It is undisputed that the entire apprehension, from bite to release, took no more than ten to fifteen seconds.

The officers then handcuffed Kuha and noticed that Kuha was bleeding from the site where Arco bit him. They applied pressure to the wound and called for an ambulance. A subsequent medical examination revealed that Arco's bite had pierced plaintiff's femoral artery, causing substantial blood loss.

*Id.* at 595-96. The Eighth Circuit, while holding that "a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender," *id.* at 588, rejected Kuha's arguments that the use of a bite-and-hold trained dog to apprehend a possible misdemeanant was a *per se* Fourth Amendment violation, or that it was objectively unreasonable for the officers to require Kuha to release Arco prior to calling off the dog. The Court explained:

As to Kuha's other claims, we conclude that neither survives summary judgment. Kuha contends that the use of a police dog trained only in the bite and hold method was objectively unreasonable. In

essence, Kuha argues that the governmental interest in apprehending a fleeing misdemeanant will never outweigh the potential harm inherent in canine assisted apprehensions. We disagree. Police dogs serve important law enforcement functions, *see Robinette,* 854 F.2d at 914 (declining to "label 'unreasonable' a police practice [dog use] which has proven useful in a variety of law enforcement situations"), and their use is not inherently dangerous. There are innumerable situations where the use of a properly trained and utilized police dog, even one trained only in the bite and hold technique, will not result in physical interaction with the suspect, most obviously because the dog remains on a leash until his handler releases him. Police are trained, and constitutionally obligated, to use only that amount of force reasonably necessary to effect a seizure. We will not presume that officers will abuse their discretion in this respect. And, as discussed above, we believe it will be the rare case where a verbal warning prior to releasing the dog would not facilitate a peaceful resolution of the situation. In sum, the mere use of a police dog trained to bite and hold does not rise to the level of a constitutional violation. *Cf. Jarrett v. Town of Yarmouth,* 309 F.3d 54, 63 (1st Cir. 2002) (discussing K-9 bite case law in context of qualified immunity, and observing that "there is no case that has held ["bite and hold"] policies to be unconstitutional"). And in this particular case, we agree that, given the odd turn of events initiated by Kuha, the initial decision to use Arco to assist in Kuha's apprehension was objectively reasonable as a matter of law.

Kuha's claim of excessive force by the officers in the moments following his apprehension by Arco is a closer question. We must decide whether, construing the facts in the light most favorable to Kuha, a jury could properly conclude that it was objectively unreasonable for the officers to require Kuha to release Arco prior to calling off the dog. *Cf. Watkins v. City of Oakland,* 145 F.3d 1087, 1090 (9th Cir. 1998) (affirming denial of qualified immunity where plaintiff raised genuine issue of material fact as to whether the force used against plaintiff, "including allowing [the K-9] to continue biting [him] until [he] showed his hands, was reasonable under the circumstances"). As Arco was biting Kuha's upper leg, Kuha's hands gripped the dog's head in an attempt to minimize the damage and pain. Officer Anderson repeatedly told Kuha that he would not call off the dog until Kuha raised his hands in the air. Kuha states that he tried to comply but his hands

12

would instinctively return to the dog's head. Eventually Kuha did comply with Officer Anderson's order and the dog was called off. Kuha emphasizes that he was nearly naked during the attack, that he was clearly unarmed, and that the officers had no indication that he was dangerous.

Kuha's argument is compelling. It does not, however, end our analysis. *Graham* requires "careful attention to the facts and circumstances of each particular case," 490 U.S. at 396, 109 S.Ct. 1865, and cautions against hindsight. *Id.* Here, the officers were confronted with an inexplicable flight from a minor traffic stop in the early hours of the morning. They knew the suspect had chosen to swim through a swamp rather than encounter a police officer. The area they were searching was difficult to traverse. The officers knew there were inhabited apartment buildings nearby and that residents would soon be leaving for work. They knew that Officer Roth had not seen a gun in the brief moments before Kuha fled, but, given the totality of the circumstances, they were reasonably wary of what they might encounter when they found Kuha, and reasonably concerned for their safety.

Turning to the actual seizure, it is undisputed that the entire incident lasted only ten to fifteen seconds. Moreover, we note that this is not a case where the officers are accused of siccing a police dog on a manifestly unarmed and compliant suspect. It appears uncontested that the officers did not see the initial seizure since Arco was ten feet ahead on his lead. They heard the scream and arrived immediately thereafter. On arrival, the officers were confronted with Arco "holding" a nearly naked suspect who had been hiding in three-feet-high grass. During the ten seconds or so that ensued, the officers were searching the area under and around Kuha to ensure that he was not hiding a weapon which could be used against the officers or the dog. At the same time, Officer Anderson was ordering Kuha to release the dog's head.

In light of the short time frame at issue and the conditions under which Kuha fled and was found, we conclude that as a matter of law the officers' actions after Kuha was bitten were not objectively unreasonable. *See Hill,* 311 F.3d at 902 (stating that issue of whether the evidence establishes a constitutional violation is a question of law).

13

> We are mindful that we must construe the facts in the light most favorable to Kuha, and we do so. But we cannot ignore the undisputed facts that are equally relevant to our analysis. To do otherwise would vitiate *Graham*'s explicit recognition of, and allowance for, a measure of deference to officer judgment given the "tense, uncertain, and rapidly evolving" circumstances that officers often confront. *Graham*, 490 U.S. at 396-97, 109 S.Ct. 1865.

*Id.* at 599-601.

In the present case, it is undisputed that before deploying Police Service Dog Bruno, Officer Pignotti "made three loud announcements, two in English and one in Spanish, stating 'Omaha Police K9, sound off now or I'll send my dog.'" (Defendants' Statement of Facts ("SOF") ¶ 7.) The record also establishes as a matter of law that the decision to deploy Bruno was objectively reasonable under the circumstances.

The first factor to consider is the severity of the crime at issue. *Graham*. 490 U.S. at 396. Here, Plaintiff was a suspect in an attempted car theft, and an attempted felony assault. (SOF ¶¶ 1-5.) Both are serious crimes. Plaintiff also ran away when Officer Richter shouted, "Stop, Police!" and he did not respond to Officer Pignotti's repeated instructions to "sound off." (SOF ¶¶ 6-7.)

The second factor in the *Graham* analysis of reasonableness is the safety of the officers and the public. *Id.* at 396. In the present case, the suspects were unknown, but were wanted for attempted automobile theft and attempted felony assault. They had fled after watching police inspect a stolen vehicle which was used in the attempted felony assault. There was ammunition and a spent shell casing in the vehicle. It was not known whether the suspects were armed. One of the suspects (later identified as the Plaintiff) was a large male. The suspects fled to a creek with running water, trees, trash, rocks, and other debris—the area was dark, and the terrain was dangerous. The suspects could see the officers coming, and could plan an ambush in the wooded area. (SOF ¶ 7.)

The third factor in the *Graham* analysis of reasonableness is whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396.

14

Plaintiff clearly demonstrated his intent to avoid arrest by running off into a wooded area near a creek, where he concealed himself by lying on the ground and covering his head with his shirt. (SOF ¶¶ 7-8.) He also failed to surrender after being warned that a police canine would be set loose. (SOF ¶ 7.)

In *Kuha*, the Eighth Circuit held as a matter of law that it was not objectively unreasonable for the K-9 officer to require Kuha to let go of the dog's head and show his hands before calling off the dog, which bit Kuha's leg for 10 to 15 seconds. In the present case, the undisputed facts establish that Plaintiff fought off Bruno after being bitten in the right armpit area, and ignored Officer Pignotti's command that he stop fighting, instead knocking Bruno into the water. (SOF ¶ 9.) When Bruno resumed the apprehension by biting Plaintiff on the right calf, Plaintiff again ignored the officer's commands—he punched the dog, grabbed his muzzle, and pushed his head underwater. (SOF ¶ 10.) It was at this point, as Plaintiff was attempting to drown the dog, that Officer Pignotti entered the creek and began punching Plaintiff about the head, while Officers Ness and Richter attempted to grab Plaintiff from higher up on the creek bank. (SOF ¶ 11.) As soon as Plaintiff stopped fighting and held up his hands, Officer Pignotti grabbed Bruno, and Bruno released Plaintiff's right calf. (SOF ¶ 12.) Bruno bit Plaintiff for a total of 15 to 30 seconds. (SOF ¶ 16.) It was not objectively unreasonable for Officer Pignotti to wait until Plaintiff raised his hands in surrender before causing Bruno to release his hold on Plaintiff's leg.

Also, because Plaintiff was actively resisting arrest, and endangering the life of Officer Pignotti's canine partner, it was not objectively unreasonable for the officer to punch Plaintiff approximately 3 times on each side of his head so that he would release his hold on the dog. (SOF ¶¶ 11-12.) *See, e.g., Winters v. Adams*, 254 F.3d 758 (8th Cir. 2001) (police officer did not use excessive force in striking appellee in the eye with a closed fist during a resisted attempt to remove appellee from his vehicle); *Wertish v. Krueger,* 433 F.3d 1063 (8th Cir. 2006) (finding no excessive force was used where suspected drunk driver refused to exit car, officers pulled him from the car and took him to the ground, an officer climbed on top of him and tried to handcuff him, suspect ignored commands to place his hands behind his back, officers forcibly twisted suspects arms behind his back and cuffed him, and at some point an officer struck suspect in the back of the head with his elbow and hit

15

him in the ribs with his knee); *Mann v. Yarnell*, 497 F.3d 822 (8th Cir. 2007) (when arrestee refused police orders to lie flat on his stomach, twisted, and otherwise continued to resist, it was reasonable to apply force against arrestee's neck, use hold maneuver on legs, and use a canine to bite arrestee to bring him under control); *Schoettle v. Jefferson Cty.*, 788 F.3d 855 (8th Cir. 2015) (sheriff's deputies' use of force to remove DWI suspect from his motor vehicle and handcuff him was objectively reasonable; suspect was belligerent, refused to comply with the deputies' orders, repeatedly attempted to evade arrest, and physically struggled against the deputies, who pulled him from the vehicle by his legs, forced him to the ground after he got up, pepper-sprayed him, and struck him about the head and body in an attempt to subdue him); *Burgess v. City of Sioux Falls*, No. CIV 17-4027, 2018 WL 2305668 (D.S.D. May 21, 2018) (arrestee took threatening action towards officers responding to 911 call, and resisted their efforts to restrain and handcuff him; in attempting to subdue him, officer sprayed arrestee in the face with pepper spray, arrestee got down on his knees but refused to lay down on the ground, so officer struck him in the back left torso with his fists and a second officer used a pressure point technique; third officer used a taser to deliver two drive stuns arrestee's thigh; held that the officers' use of force was objectively reasonable under the circumstances); *Chambers v. Watson*, No. 6:18-CV-06091, 2020 WL 1060326 (W.D. Ark. Feb. 3, 2020) (where pretrial detainee attacked officer from behind following book-in at jail, officer did not use excessive force by striking detainee in the face several times with a closed fist as detainee continued to resist), *report and recommendation adopted*, 2020 WL 1044017 (W.D. Ark. Mar. 4, 2020).

Significantly, there is no evidence that Plaintiff suffered any physical injury from being punched by Officer Pignotti.[3] "A de minimis use of force is insufficient

---

[3] There was blood coming from Plaintiff's ear (SOF ¶ 14), and he received 10 stitches to his left ear at the hospital (SOF ¶ 18), but there is no indication that Officer Pignotti caused this injury. Plaintiff's medical records, which are attached to his Amended Complaint, show that the ear injury was a dog bite. (Filing No. 15, p. 12 ("[Plaintiff] was bitten by the police dog during a chase. Puncture wounds to ear and L leg."), p. 13 ("He was bitten on the right calf, right shoulder, and left ear."), p. 14 (2.5 cm through-and-through bite wound of the central right [*sic*] pinna involving cartilage."), p. 16 ("Alleged dog bite wounds," including "Left ear 2.5 length in front

to support a claim, and it may well be that most plaintiffs showing only de minimis injury can show only a corresponding de minimis use of force." *Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019) (quoting *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)). This lack of evidence reinforces the court's view that Officer Pignotti did not use excessive force in striking Plaintiff. *See, e.g., McAllister v. Dean*, No. 4:13-CV-2492 CEJ, 2015 WL 4647913, at *5 (E.D. Mo. Aug. 5, 2015) ("The undisputed facts establish that plaintiff was treated for bite wounds and declared fit for confinement. Plaintiff did not sustain any cuts and cannot identify any bruises caused by [Officer] Boyd [who allegedly punched plaintiff repeatedly on his head]. He was not diagnosed with concussion. A week after the incident, it was determined that he had a broken finger—an injury that he attributes to a dog bite, not to Boyd's conduct. Furthermore, plaintiff does not allege that he has any ongoing symptoms or medical conditions as a consequence of being struck by Boyd. Thus, any injuries that plaintiff sustained as a result of his encounter with Boyd were minor and support a conclusion that the force used was minor.").

There is no evidence that Officers Nass and Richter did anything other than to attempt to grab Plaintiff while he was fighting with Bruno, pull Plaintiff out of the water after he surrendered, and place him in handcuffs. (SOF ¶¶ 11, 13.) Officer Hansen was securing the stolen vehicle and did not witness the search, apprehension, or arrest of the Plaintiff. (SOF ¶ 15.) Thus, there is no evidence to support Plaintiff's claim that these officers used excessive force. Plaintiff's claim that the officers failed to intervene to protect him necessarily fails because there is not sufficient evidence that Officer Pignotti used excessive force. *See Farrington v. Smith*, 707 F.3d 963, 972 (8th Cir. 2013) ("Thus, [the jury's determination] that [Officer Smith] did not use excessive force is fatal to [Farrington's] claims that the remaining defendants unconstitutionally failed to intervene."). In addition, the evidence shows that Officer Hansen could not have witnessed the alleged used of excessive force.

---

and 2.5 length in back").) Plaintiff also specifically alleges that "this atypical brutal attack began with the K-9 dog biting, then ripping my left ear," and that he experienced "excessive pain and ringing in my left ear due to police K-9 bitting [*sic*] my ear half way off." (Filing No. 14, p. 5; Filing No. 1, p. 6.)

In summary, the court concludes that the first prong of the qualified immunity analysis is satisfied here because Plaintiff has not shown that any Defendant violated his Fourth Amendment right to be free from excessive force. The undisputed evidence presented by Defendants shows that their actions in apprehending and arresting Plaintiff were objectively reasonable under the "tense, uncertain, and rapidly evolving" circumstances with which they were confronted. *See Graham*, 490 U.S. at 396-97.

### b. No Clearly Established Law Precluded Defendants' Actions

Under the second prong of the qualified immunity analysis, "the plaintiff must demonstrate the law was clearly established." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). The relevant question is whether a reasonable officer would have fair warning that his conduct was unlawful. *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019).

A plaintiff must identify either "controlling authority" or "a robust consensus of cases of persuasive authority" that placed the constitutional question "beyond debate" at the time of the alleged violation. *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019). "A plaintiff need not always identify a case directly on point, but controlling authority or a robust consensus of cases of persuasive authority must put the statutory or constitutional question beyond debate." *Anderson*, 934 F.3d at 881 (quoting *Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019)).

The state of the law should not be examined at a high level of generality. *Kelsay*, 933 F.3d at 979. "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (emphasis in original; internal quotation marks and citation omitted). "Such specificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal quotation

marks omitted). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (internal quotation marks omitted). "[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

As of November 2, 2015, there was no controlling authority or "robust consensus of persuasive authority" to provide Defendants fair warning that the deployment of Bruno, or the failure to call him off before Plaintiff surrendered, would violate Plaintiff's constitutional rights. The Eighth Circuit held in 2004 that "a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender," *Kuha*, 365 F.3d at 598, but the evidence in the present case conclusively establishes that Plaintiff was warned and given ample opportunity to surrender before Bruno was deployed. In a 2007 decision, which held that a city's written policy concerning the use of police dogs was lawful on its face, the Eighth Circuit "assume[d] that employment of canines in 'arresting known dangerous criminals' or in 'apprehension work' will sometimes involve using a dog to bite and hold a suspect, but [held] it is not unconstitutional to use dogs for those purposes." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 391 (8th Cir. 2007). In another 2007 decision, the Eighth Circuit stated: "In light of Mann's failure to comply with the officers' instructions and warnings, we cannot say that Officer Willett's use of Rex in a bite and hold maneuver on Mann's leg could be considered an unreasonable use of force for the purpose of bringing the non-compliant [plaintiff] under control." *Mann*, 497 F.3d at 826. The Court did hold in a 2014 unpublished decision that on the particular facts presented in that case, "a reasonable officer would not think that redeploying the police dog was a reasonable amount of force." *Smith v. Buck*, 564 F. App'x 258 (8th Cir. 2014). "At the point the dog was redeployed [and bit the

upper portion of Smith's left leg, leaving two puncture wounds], Smith had obeyed Officer Palmquist's command; Smith was on his knees with his hands in the air; he was surrounded by many officers with guns drawn and pointed at him; and Officer Palmquist, who was directing the situation, was preparing to handcuff Smith." *Id.* That obviously is a far different set of facts than what is presented in this case, where Plaintiff did not surrender until after Bruno made the second apprehension and Officer Pignotti punched Plaintiff approximately six times. The fact situation here most closely resembles that of *Kuha*, in which the Eighth Circuit also concluded as a matter of law that it was not objectively unreasonable for the dog handler to refuse to call off the dog until Kuha let go of the dog and put his hands up. The court's independent research has not led to the discovery of any case in which a properly deployed police dog biting a noncompliant, actively resisting suspect for 15-30 seconds was held to be a Fourth Amendment violation.[4]

District court judges in this circuit who have had occasion to consider cases involving the "bite and hold" method of apprehension have dismissed § 1983 claims based on the second prong of qualified immunity. In *Birkeland as trustee for Birkeland v. Jorgenson*, No. CV 17-1149 (DWF/LIB), 2019 WL 1936736 (D. Minn. May 1, 2019), a police dog was deployed in a one-bedroom apartment and bit the occupant, who had been hiding in a closet. While finding that a reasonable juror could conclude that the deployment was not objectively reasonable because the officers were called to the apartment to conduct a welfare check on the man, who had a known history of mental health issues, the court ruled that the officers were entitled to qualified immunity because "Plaintiff has not cited to authority that places

---

[4] In *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998), which is cited in the *Kuha* opinion, the Ninth Circuit denied qualified immunity after finding it was clearly established that "excessive duration of the bite [for up to thirty seconds] and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation." *Id.* 1093; *see id.* at 1090. "But the court failed to explain why it was clearly established that a thirty-second bite *was* excessive under the circumstances (as the correct analysis required)." *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020). "Thus, *Watkins* arguably made the all-too-common error of 'defin[ing] clearly established law at a high level of generality.'" *Id.* (quoting *Kisela*, 138 S. Ct. at 1152).

the question of the use of the police dog in this situation beyond debate." 2019 WL 1936736, at *7. In *Godbold v. Hammons*, No. 6:16-CV-06073, 2018 WL 10560770 (W.D. Ark. Oct. 19, 2018), *aff'd*, 787 F. App'x 359 (8th Cir. 2019), the district judge found that "no reasonable jury could find that the force involved in the use of [the police dog] to subdue and apprehend Plaintiff was excessive as the record clearly shows that Plaintiff [who was stopped for a traffic offense but was being arrested for suspected possession of drugs] resisted Defendants' attempts to handcuff him, refused to follow Defendants; orders, actively attempted to strike and actually struck a law enforcement animal, and attempted to get away from Defendants. Further, the record reflects that Plaintiff was never fully handcuffed when [the police dog] was deployed, was warned that she would be deployed if he did not comply with the officers' instructions, and continued to resist after she was deployed, successfully breaking free of her initial hold." 2018 WL 10560770, at *8. In addition, the judge concluded that "[u]nder these facts and existing precedent, … a reasonable police officer would not believe that using a police dog to subdue Plaintiff would violate Plaintiff's constitutional right to be free from excessive force." *Id.*, at *9. And in *Mortensbak v. Butler*, 102 F. Supp. 3d 1085 (D.S.D. 2015), "[a]t the time [the police dog] was deployed, Mortensbak, noticeably drunk, had led Officer Butler on a high-speed chase through residential areas of Sioux Falls, putting himself, Officer Butler, Mortensbak's passenger, and others in the area at risk. When [the dog] was deployed, Mortensbak was still resisting arrest and appeared to be trying to get the pickup moving again to resume his flight." *Id.* at 1096. The district judge granted Defendants' motion for summary judgment after finding that "the use of force, including the assistance of a police dog to subdue Mortensbak, was objectively reasonable," and also determining that "[e]ven if a reasonable jury could find that Mortensbak's Fourth Amendment rights had been violated, the second prong of the qualified immunity doctrine—whether the officers violated a clearly established right—would shield the Defendants from liability." *Id.* at 1096-97.

There also is no clearly established law that would put Officer Pignotti on notice that he could not administer blows to Plaintiff's head in attempting to subdue Plaintiff. In *Taylor v. Holtmeyer*, 183 F. Supp. 3d 962 (D. Neb. 2016), an arrestee brought a § 1983 action against city police officer, alleging that the officer had used excessive force by holding him around the neck and striking him in the head during

a struggle. The plaintiff's expert opined that the blow to the head created a substantial risk of serious bodily injury, but, as Judge Gerard observed, "any such risk was not realized, and it is significant that Taylor suffered only minor injuries." *Id.* at 974. Judge Gerard continued:

> The Court is aware that evidence of only de minimis *injury* does not necessarily foreclose a claim of excessive force under the Fourth Amendment. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011). The appropriate inquiry is whether the *force* used to effect a particular seizure is reasonable. *Id.* It is logically possible to prove an excessive use of force that caused only a minor injury, and the rule should focus on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used. *Id.* But a de minimis use of force is insufficient to support a claim, and it may well be that a plaintiff showing only de minimis injury can show only a corresponding de minimis use of force—the degree of injury is relevant insofar as it tends to show the amount and type of force used. *Id.* Characterizing the force used here as creating a risk of serious injury does not change the fact that Taylor was not significantly injured, which suggests in turn that the amount of force actually used—regardless of what *could* have happened—was not particularly significant either.
>
> * * *
>
> The Court is aware of no precedent, and Taylor does not cite the Court to any precedent, that puts it "beyond debate" whether Holtmeyer acted unreasonably in this case…. The cases cited by Taylor here are, in the Court's view, meaningfully distinguishable, primarily because there was evidence in each case that the suspect being taken into custody was offering no resistance to the arresting officer, and no reason to believe the suspect had a weapon or access to one…. Having reviewed the evidence in this case, the Court finds that a reasonable officer in Holtmeyer's position *could* have seen Taylor's behavior as noncompliance and then resistance, and believed such behavior in close proximity to a weapon warranted a use of force. While the Court must view the evidence in the light most favorable to Taylor, the Court must also afford Holtmeyer "substantial latitude in interpreting and drawing inferences from factual circumstances[.]" *Meehan v. Thompson*, 763 F.3d 936, 942 (8th Cir. 2014) (citation and quotation omitted).

*Id.* at 974-75. In concluding that the officer was entitled to qualified immunity, Judge Gerard also examined two Eighth Circuit decisions which were closer on their facts to *Taylor*:

> On the other side of the ledger is the Eighth Circuit's decision in *Nelson v. County of Wright*, in which the Court of Appeals reviewed a conclusion that, even viewing the evidence in the light most favorable to the plaintiff, an officer's actions had been objectively reasonable when he used potentially deadly force to subdue the plaintiff. 162 F.3d 986 (8th Cir. 1998). In *Nelson*, the officer had been informed that the plaintiff was suicidal and had been acting violently, and that he had taken a number of unknown pills. The plaintiff actively resisted the officer's efforts to arrest him, leading to a struggle in which the plaintiff at one point reached for the officer's gun and then knocked the officer down. At some point, the officer struck the plaintiff over the head with his baton. After being knocked down a second time, the officer fired his gun and wounded the plaintiff. The entire incident lasted less than 3 minutes. *Id.* at 988-89. The Eighth Circuit found the officer was entitled to qualified immunity, ….

> The Court recognizes that *Nelson* is distinguishable on some points. In particular, the plaintiff in *Nelson* offered more palpable resistance—but, on the other hand, the officer in *Nelson* used correspondingly greater force….

> The Court also notes *Smith v. City of Minneapolis*, in which an officer was dispatched to a domestic dispute after it was reported that a man was reportedly armed with a rifle and "ready to fight." 754 F.3d 541, 544 (8th Cir. 2014). The responding officer located the suspect running outdoors near the scene of the report, but without a rifle. The officer drew his weapon and ordered the suspect to the ground. The suspect turned to face the officer, with his hands in front of his face and his palms down, but did not drop to the ground. The officer approached the suspect and attempted to get him to the ground by kicking him in the thigh and punching him in the head. The suspect turned and ran, and managed to escape by tumbling over a fence. The suspect was eventually caught and substantial force was used to subdue him, after which it was discovered that he was not breathing, and he died on the way to the hospital. *Id*

The Eighth Circuit found that each of the officers involved was entitled to qualified immunity, but it is the first, initial encounter that is factually relevant here. The plaintiff in *Smith*—supported by expert opinion testimony—argued that it was unreasonable for the officer to approach the suspect and use force when the suspect did not behave aggressively and appeared to be trying to surrender. The Court of Appeals rejected that argument, reasoning that

> in the "particularized" situation here, an officer attempted to effectuate an arrest by ordering the suspect to the ground, that is, a large and potentially armed man who was suspected of domestic abuse and making threats with a gun. The man refused to comply with the officer's orders. To get this suspect to the ground and apply handcuffs in order to control the suspect and protect the police and the public, the officer approached the suspect and attempted to subdue him with a hit and a kick, not deadly force. [The plaintiff] has not cited any case that would render the "constitutional question beyond debate" and would put [the officer] on notice that such actions during this first encounter would violate [the suspect]'s constitutional right to be free from unreasonable seizure. [The plaintiff] only cites [the expert]'s obviously hindsight-based report, which does not constitute clearly established law. Because we do not find any clearly established law supporting [the plaintiff]'s claim, and any violation is not obvious, [the officer] is entitled to qualified immunity for his actions during his initial encounter with [the suspect].

*Id.* at 547.

Again, *Smith* is potentially distinguishable—but, as in *Smith*, Holtmeyer faced a man suspected of domestic abuse and possession of a firearm, and it was reasonable for Holtmeyer to conclude that Taylor was at least passively resisting Holtmeyer's attempt to take him into custody. *Smith* is not precisely on point, but it is sufficiently comparable to illustrate why Holtmeyer's conduct was at the very least debatable. In light of *Nelson* and *Smith*, the Court cannot find that it was "clearly established" that Holtmeyer's use of force was unreasonable in the circumstances he faced. *See also, e.g., Blazek v. City of Iowa City*, 761

F.3d 920, 924 (8th Cir. 2014); *Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir. 2006).

> In sum, the Court finds that even if it could be said, when the evidence is seen in the light most favorable to Taylor, that Holtmeyer's use of force was unreasonable, existing precedent does not place that conclusion beyond debate.

*Id.* at 976-78.

So, too, in the present case, even if a jury could conclude that the officers' actions were not objectively reasonable, the question was not beyond debate at the time of the alleged violation.

## VII. CONCLUSION

Because Plaintiff cannot establish that any Defendant violated his Fourth Amendment right to be free from excessive force, and, in any event, has not shown that the alleged right was clearly established, Defendants are entitled to qualified immunity.

IT IS THEREFORE ORDERED:

1.     Defendants' motion for summary judgment (Filing No. 46) is granted, and this case is dismissed with prejudice.

2.     Judgment shall be entered by separate document.

Dated this 27th day of April, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge

25